Heinz Binder, Esq. (SBN 87908)
Robert G. Harris (SBN 124678)
Wendy Watrous Smith (SBN 133887)
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: Heinz@bindermalter.com
Email: Rob@bindermalter.com
Email: Wendy@bindermalter.com

Attorney for Debtor and Debtor-in-Possession
Blade Global Corporation

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA - DIVISION 5

| | |
|---|---|
| In re:<br><br>BLADE GLOBAL CORPORATION,<br><br><br>Debtor. | Case No. 21-50275 MEH<br><br>Chapter 11<br><br><br>Date: TBD<br>Time: TBD<br>Place: Via tele/video conference |

**Declaration Of Perry Michael Fischer In Support Of Multiple First- Day Motions For Blade Global Corporation**

I, Perry Michael Fischer declare:

1. I am the Sole Director and Responsible Individual of the debtor and debtor-in-possession of Blade Global Corporation ("Blade Global" and the "Debtor"), and am authorized to make these statements on its behalf. I have personal knowledge of the facts stated here, except where it is indicated that they statement is made on my information and belief, in which case, I believe the statement to be true. If called upon, I would testify to the truth of the following:

///

///

///

Background of the Debtor

2. The Debtor's parent company was founded in France in 2015 as a service to deliver a Windows PC cloud-gaming service that is sufficiently robust to play high-end PC games. The service, under the trademark the "Shadow," was expanded from Europe to the US in 2017 with the creation of Blade Global Corporation –the Debtor. Together, the two companies now serve over 100,000 subscribers through data centers based in California, New Jersey, Illinois, and Texas, as well as Europe. A small pilot program of fewer than 1000 users is also being tested in Korea.

3. Despite positive reviews and high levels of customer satisfaction for Blade's service, the company has struggled to build a profitable business model. The capital expense of the server infrastructure and the operating expense of data centers remains high compared to subscription revenue. Expected improvements in the capacity of the infrastructure and reduction operating costs have been delayed, which resulted in growing operating losses. Since late 2020, the company has been postponing payments to suppliers, which, combined with existing bank debt, has resulted in financial obligations the company is no longer able to meet. Attempts to raise additional capital have also been unsuccessful.

4. The Debtor has filed a voluntary petition for relief under the Bankruptcy Code in this Court on March 1, 2021 (the "Petition Date"). The Debtor continues to operate its business and manage its properties. No party has requested the appointment of a trustee or examiner in the Chapter 11 Case and no statutory committee has been appointed.

Planned Asset Sale

5. The Debtor is a party to a letter of intent for acquisition of all assets by Jezby Ventures, a company incorporated under the laws of France under n°883 924 771 RCS Paris ("Jezby"). The proposed purchase price is $1 million. A true and correct copy of the letter of intent is attached hereto as Exhibit "A". Jezby is an unrelated third-party offeror.

6. Jezby is to the stalking horse bidder in a fully-noticed auction to be held prior to April 9, 2021. A form of asset purchase agreement ("APA") is being prepared for signing, and a bid procedures motion, assuming no delays in agreement on the APA, will be submitted to the court for approval by March 10, 2021.

7. Jezby's willingness to proceed is conditioned upon its also acquiring the assets of the Debtor's parent corporation, Blade SAS. Blade SAS is now the subject of a *redressement judiciaire* in France. Offers to purchase the assets of Blade SAS are being received through mid-March.

Utilities Use

8. The Debtor maintains corporate offices in Mountain View, California, and has servers to support its business located in California, Texas, New Jersey; and Illinois. The Debtor purchases internet access for both its corporate operation and to support its servers from Comcast, Inc. ("Comcast") and Zayo Group, LLC ("Zayo" and, with Comcast, the "Utilities"). [1]

9. Each Utility bills the Debtor directly. Over the last year the Debtor has disputed certain of the invoices from both Utilities. It has withheld payment from Zayo, and partially withheld payments from Comcast in its attempt to resolve the dispute. As to Comcast, the Debtor has been paying certain undisputed invoices; as to Zayo, the Debtor is ready to provide adequate assurance and to pay the current invoices (which are less than $6,000 per month) as set forth below.

10. Maintaining uninterrupted utility services is critical for the Debtor's ongoing operation. Any interruption in utility services—even for a brief period of time—could have a severe impact on the Debtor's business and irreparably impair the Debtor's restructuring efforts to the detriment of all stakeholders. It is therefore critical that the Debtor obtain the relief requested here to assure it is able to provide its customers with uninterrupted services.

11. The Debtor has sufficient cash resources to meet its post-petition obligations in the ordinary course of business for the next eight weeks, including payments to the Utilities for current services as they become due. Specifically, the monthly charge for service from Comcast is approximately $21,000; the monthly charge for service from Zayo is approximately $5,500. The Debtor proposes to make cash deposits with each Utility equal to two months of the estimated

---

[1] At all of its locations, Debtor pays its landlord for electricity as part of its lease or license agreement.

monthly utility cost incurred by the Debtor—a deposit of $42,000 to Comcast and of $11,000 to Zayo (the "Deposits"). The Debtor submits that the Deposits, in conjunction with the Debtor's ability to pay for future Utility Service in the ordinary course of business, constitute sufficient adequate assurance to each Utility.

12. The Debtor believes that providing each Utility with a two-moth cash deposit is consistent with what each Utility would expect from any similarly situated non-debtor entity. The Debtor believes that the Adequate Assurance Procedures detailed in the accompanying Utility Motion are not prejudicial to the rights of the Utilities and are in the best interests of the Debtor's estate and its creditors. The Debtor submits that the Adequate Assurance Procedures described in the Utility Motion, if approved, will ensure that the Debtor's business operations are not jeopardized by any disruption in Utility service while promoting judicial economy and addressing any issues that may arise under section 366 of the Bankruptcy Code.

<u>Employee Obligations:</u>

13. The Debtor currently has 19 employees working in California, and also employs two individual contractors in Korea (collectively, employees). The employees work in management, clerical support, accounting, engineering, customer support, and marketing, and are essential for the Debtor's business. The employees are particularly familiar with the Debtor's Shadow service, from both the technical and marketing perspective. They would be extremely difficult for the Debtor to replace in light of the need to specifically train any new employee regarding the service. In order for the Debtor to effectuate a seamless operation into and during its Chapter 11 it is essential for it to maintain its knowledgeable staff.

14. The Debtor maintains certain compensation and benefits programs and pays various administrative fees and insurance premiums in connection therewith (collectively, the "Compensation and Benefits Programs"), including the following (each as defined below):

    (a)    Employee Compensation Obligations;

    (b)    Paid Time Off ("PTO")

    (c)    Payroll Processing Fees;

    (d)    Withholdings;

(e) Reimbursable Expenses;

(f) Health Insurance Plans;

(g) Dental, Life, Long Term Disability & Vision Care Insurance ("Additional Coverage"; and

(h) 401(k) Plans.

15. The vast majority of the Debtor's Employees rely primarily on the compensation and benefits they receive from the Debtor under the Compensation and Benefits Programs to pay their daily living expenses. The Debtor is informed and believes that the Employees and their families would be subject to significant financial hardship if the Debtor could not honor pre-petition obligations that may be outstanding as of the Petition Date under the Compensation and Benefits Programs or continue to administer the Compensation and Benefits Programs without interruption during the pendency of the Debtor's chapter 11 case.

16. Further, the Debtor's failure to honor their obligations in connection with the Compensation and Benefits Programs could likely result in detrimental attrition in light of the already minimal number of Employees currently employed by the Debtor. The Debtor needs its Employees to perform at peak efficiency and would have extreme difficulty in replacing any such Employees given the competitive labor markets in which the Debtor operates and the financial condition of the Debtor.

17. Subject to Court approval and the terms and conditions set forth herein, the Debtor intends to continue to administer the Compensation and Benefits Programs in the ordinary course of its business. The Debtor estimates that, as of the Petition Date, it owes approximately $38,529.00 in connection with the Compensation and Benefits Programs as described below. The Debtor is not currently aware of any other pre-petition employee obligations that it currently owes to its current employees, but, in an excess of caution, also requests authority to pay an aggregate amount, not to exceed $132,250, of obligations arising from the Compensation and Benefits Programs in the ordinary course of its business that relate to pre-petition events (collectively, "Pre-petition Employee

Obligations").[2] Allowed payment of Pre-petition Employee Obligations would also be limited as to each employee to the $13,650 priority cap described in sections 507(a) (4) and 507(a)(5) of the Bankruptcy Code.

18. Most of the Debtor's obligations for its Compensation and Benefits Programs are paid in advance. Debtor's current known Pre-petition Employee Obligations are: approximately $10,000 to Kaiser Permanente; $3,807.61 for certain contributions to a 401K program; $23,950 salary due for January and February to two independent contractors located in Korea (the payment to one contractor will be reduced to $13,650); and $1,071.50 which had been withheld from an employee paycheck for payment for child support[3], for a total of $38,529.11. As described in greater detail below, the Debtor's monthly employee-related costs are approximately: $134,000 in salaries; $19,000 for contracted employees; $33,500 for insurance programs; $74,000 in taxes; and $4,000 for payroll services, for a total of approximately $264,500. Debtor also incurs obligation to its employees for paid time off, although this is not a payment obligation unless an employee is terminated, as set forth below. If the Debtor determines that some additional amount of the Pre-Petition Employee Obligations is owing, it seeks permission to pay it as described.

19. The Debtor incurs payroll obligations in the ordinary course of business, including wages, salaries, and other compensation provided to its Employees, as well as all related withholdings, deductions and expense reimbursement obligations (collectively, and along with any related obligations and administrative costs outlined or referenced herein, the "Employee Compensation Obligations"). By this Motion, the Debtor is requesting authority to pay all accrued but unpaid Employee Compensation Obligations (collectively, the "Unpaid Compensation"). The Debtor is also requesting authority to continue to pay, fund, or otherwise honor the Employee Compensation Obligations on a post-petition basis in the ordinary course of business consistent with their pre-petition practices.

---

[2] This is rough one half of the monthly cost for the Compensation and Benefits Program.

[3] The withholdings for the 401k program and child support are not technically property of the Debtor as they were withheld from the employees' wages; they ae included here because the funds are currently in the Debtors control.

DECLARATION OF PERRY MICHAEL FISCHER IN SUPPORT OF MULTIPLE FIRST- DAY MOTIONS FOR BLADE GLOBAL CORPORATION

20. All of the Debtor's Employees are paid on a salaried basis through the payroll date. Paychecks are issued semi-monthly on the 15th and last day of the month, or the preceding workday if the normal payday falls on a holiday or weekend. The Debtor uses Rippling Payments, Inc. as its third-party payroll administrator, which deposits semi-monthly salary payments directly into employees' bank accounts. Debtor pays its two contracted employees directly. The Debtor's aggregate average semi-monthly payroll is approximately $67,000.

21. As of the Petition Date, the Debtor expects to owe no more than $23,950 to their Employees for Unpaid Compensation, all of which was earned within 180 days before the Petition Date. The Debtor also expects that it will be obligated for paid time off ("PTO") to existing employees. This sum will only be payable to an employee if he or she leaves and has not taken all accrued time. Accordingly, to the extent further Employees are terminated and the accrued PTO becomes due, the Debtors respectfully request authority to honor the Employees' PTO balances and continue honoring the Leave Policies in the ordinary course of business and consistent with their pre-petition practices.

22. The Debtor is required by law to withhold from Employees' wages, salaries and other compensation certain amounts related to federal, state, and local income taxes and Social Security, and imputed taxes for remittance to the appropriate taxing authorities (collectively the "Withholdings"). Further, the Debtor must match Social Security taxes and pay based on a percentage of gross payroll, additional amounts for federal and state unemployment, and disability insurance (the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes") from their own funds. The Debtor's payroll service debits the total amount of Payroll Taxes due from the applicable account of the Debtor three to four days before each payroll date and then remits the Payroll Taxes to the appropriate taxing authorities on behalf of the Debtor on the dates such Payroll Taxes are due.

23. The Debtor does not believe that there are currently accrued Withholding Obligations outstanding as of the Petition Date, other than $3,807.61 for 401k withholding, and $1,071.52 for child support. Due to the commencement of the Chapter 11 Cases, certain other pre-petition Withholding Obligations may not have been remitted by the payroll agent to the appropriate recipient

before the Petition Date. The Debtor therefore respectfully requests authority (i) to process, or to direct its payroll agent to process, any unpaid or unremitted Withholding Obligations as of the Petition Date, and (ii) to continue to honor and process, or to direct its payroll agent to continue to process, Withholding Obligations on a post-petition basis, in the ordinary course of business, in accordance with their pre-petition practices.

24. The Debtor offers its Employees and Employees' dependent(s) medical benefits through a choice of an HSA and a PPO medical provider. This benefit covers necessary medical care and treatments, including routine care, hospital care and prescription drugs through either Kaiser Permanente ("Kaiser") or Anthem Blue Cross ("Anthem" and together with Kaiser, the "Health Insurance Providers") that vary depending upon the Employee's home state and coverage election (collectively, the "Health Plans"). Each of the Health Plans offers comprehensive medical and preventive care coverage. A portion of Employees' premiums are deducted from their pay, but the individual Employee's deductibles, co-pays, and out-of-pocket costs vary depending on which Health Plan was elected. The Health Plans are fully-funded by the Debtor, with either Kaiser or Anthem administering the benefits, processing claims, and submitting invoices for reimbursement by the Debtor on a monthly basis for those specific plans. The total cost of the Health Plans averages approximately $30,000 per month.

25. As of the Petition Date, the Debtor believes that it is current in its payment for the Health Plan as the payments are made in advance, with a single payment due to Kaiser Permanente of approximately $10,000. In an excess of caution, however, and to avoid an emergency motion the Debtor seeks permission to pay any Health Plan obligations in the ordinary course of business, including to replace any payment made pre-petition that does not clear before the bankruptcy is filed. The Debtor does not believe this will occur, but the cost would be no greater than the ordinary monthly obligation.

26. The Debtor also provides Employees with additional insurance to cover costs for dental care; vision care; long term disability; and life insurance (together "Additional Coverage"). These are provided through Principal. Each participating Employee's premiums, deductibles, co-pays, and out-of-pocket costs vary depending on which Additional Coverage the Employee selects

and whether the Employee has dependents covered by the Additional Coverage. The Debtor remits approximately $3,500 per month to pay for Additional Coverage, and does not believe that any payments are owed to Principal at this time.

I declare under the penalty of perjury of the laws of the United States that the forgoing statements are true and correct. Executed this 8th day of March, 2021, in Los Angeles, California

                /s/ *Perry Michael Fischer*
                Perry Michael Fischer

March 1, 2021

Mr. Perry Michael Fischer
67 E. Evelyn Avenue, Ste 7
Mountain View, CA 940041

**Via Email**

Dear Mr. Fischer:

What follows is our indication of interest (the "Letter of Intent") for the acquisition by Jezby Ventures, a company incorporated under the laws of France under n°883 924 771 RCS Paris (or a company designated by Jezby) (either, "Jezby") of all assets referred to in Attachment 1 (the "Assets") which Blade Global Corporation ("Seller") is offering for sale. The acquisition of the Assets by Jezby from Seller shall hereafter be referred to as the "Transaction" and the date on which the Transaction closes shall be the "Closing," which shall be held no later than three (3) business days following the Sale Hearing Date, as defined below, provided that the Bankruptcy Court (as hereinafter defined) enters an order modifying the ten-day stay contained in Bankruptcy Rule 6004(g), failing which such date shall be on the first business day after the stay expires (the date of such Closing, the "Closing Date"). The Transaction terms will involve a post-closing obligation of the Seller to maintain certain designated equipment and data center leases, agreements or arrangements in place, at Jezby's cost, for an interim period of six (6) to nine (9) months after the Closing Date and before confirmation of a plan in the Bankruptcy Court, so that equipment and data belonging to the clients of Seller can be properly migrated by Jezby to operate the Assets without operational disruption. The Assets would be transferred to Jezby at the Closing with the approval of the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), pursuant to a sale hearing conducted under § 363 of the United States Bankruptcy Code (the "Sale Hearing") on April 9, 2021, or the soonest date thereafter made available by the Bankruptcy Court (the "Sale Hearing Date"), free and clear of all liens, charges, claims and encumbrances. By executing this Letter of Intent, the signatories are expressing their intent to work towards the preparation, authorization, execution, and delivery of agreements relating to the Transaction and to consummate the Transaction subject to, among others, the terms and conditions hereof.

1. <u>Effect of the Letter of Intent</u>. Except as set forth in this Paragraph, this Letter of Intent is not intended to be, and shall not constitute, a binding or enforceable agreement among the signatories. Nothing herein shall be deemed to constitute a binding offer or a commitment to make such an offer. Instead, it merely sets forth the signatories' present intentions with respect to the terms proposed, which terms may or may not become part of a definitive agreement, as a basis for future negotiations, and remains subject to contract. It is not based on any existing agreement between the signatories and, except as provided in this Paragraph, is not intended to impose any obligation whatsoever to bargain in good faith or in any way other than at arms' length. Except for the provisions of this Paragraph

1 and Paragraphs 4, 5, 6, 7 and 9, which are intended to be binding agreements of Jezby and Seller (collectively, the "Binding Provisions"), no legal or equitable rights, responsibilities or duties are created hereby. Neither party may reasonably rely on any promise inconsistent with this Paragraph. This Paragraph supersedes all other conflicting or ambiguous language in this Letter of Intent or any other instrument or any understanding pursuant to any oral communication that may precede this Letter of Intent.

2. <u>Purchase Price</u>. Jezby will pay, subject to terms consistent with this Letter of Intent to be agreed upon in the Definitive Purchase Agreement (defined below), to Seller an amount in cash equal to $1,000,000 (as the purchase price is incorporated into the Definitive Purchase Agreement, the "Total Consideration"), in consideration for all of the Assets as set forth in <u>Attachment 1</u>, free and clear of any claims, liabilities, liens, encumbrances, charges, adverse interests or security rights whatsoever. Jezby shall have the right to select the executory contracts and unexpired leases that it wishes to assume, if any, and the Seller shall seek to assume and assign any such executory contracts and unexpired leases to Jezby at Closing, and shall reject all other executory contracts and unexpired leases. Jezby shall not be liable for any cure cost in respect of the assumption and assignment of any contract or lease comprising the Assets.

3. <u>Negotiation of Definitive Purchase Agreement</u>. The signatories intend to negotiate definitive and binding Transaction agreements and related documents (collectively, the "Definitive Purchase Agreement") to be executed as soon as practicable and in no event later than the deadline set forth below for execution of the Definitive Purchase Agreement. The Definitive Purchase Agreement shall contain terms consistent with the terms of this Letter of Intent, and shall contain such other terms and conditions as are customary in bankruptcy transactions, the Reimbursement Payment (defined below) provisions as provided below and such other terms and conditions as the parties shall agree, but without any conditions to close other than bankruptcy court approval (e.g., no financing contingency, no due diligence contingency, and no "board approval" or similar contingency). The Definitive Purchase Agreement shall contain a Deposit (defined below) requirement, as set forth below.

4. <u>Withdrawal</u>. Either Seller or Jezby shall have the right to withdraw and terminate this Letter of Intent for any reason prior to the execution of the Definitive Purchase Agreement, and such withdrawal and termination shall not constitute a breach of this Letter of Intent, and shall not entitle the non-withdrawing party to any damages as a result thereof.

5. <u>Conduct of Business</u>. During the period from the date of this Letter of Intent to the Closing pursuant to the Definitive Purchase Agreement or the earlier termination of this Letter of Intent, Seller agrees that it will:

(a) conduct the businesses supported by the Assets in substantially the same manner as it has been regularly conducted and it shall not (i) enter into, amend or terminate any material contract, nor (ii) sell or otherwise transfer any monies or assets to any person other than as set forth herein; and

(b)    use commercially reasonable efforts to maintain the operations, employees, customers, suppliers, licenses and operations related to the Assets as an ongoing business, subject to applicable bankruptcy and creditor protection provisions, in accordance with past custom and practice.

6.    Termination Fees. Jezby shall be entitled to certain termination fees (collectively, the "Termination Fees") in the event the Transaction is not consummated for certain reasons after a Definitive Purchase Agreement is executed by the parties:

(a)    cash reimbursement for all out-of-pocket expenses incurred by Jezby and its respective advisors in connection with the due diligence review of the Seller and the negotiation and preparation of the Definitive Purchase Agreement, including Jezby's expenses regarding counsel, accountants and other advisors, up to an aggregate amount of $150,000 (the "Reimbursement Payment"), if Jezby is ready, willing and able to close the Transaction, but the Transaction is not consummated for any reason (including, but not limited to, the failure to obtain Bankruptcy Court approval of the Transaction, or the sale of all or part of the Assets to a party other than Jezby for a purchase price higher than that stated in the Definitive Purchase Agreement), other than a default by Jezby under the Definitive Purchase Agreement. Regardless of whether the Reimbursement Payment becomes due, Seller shall not acquire any rights over Jezby's due diligence work product. The Reimbursement Payment, if due, shall be made promptly after the event triggering termination of the proposed Transaction;

(b)    a termination fee equal to 3% of the Total Consideration (the "Break-up Fee") payable if Jezby is ready, willing and able to close the Transaction, but any or all of the Assets or the equity interests of Seller are sold separately or in conjunction with other assets of Seller at the Sale Hearing pursuant to a bid deemed higher or better than the indicative bid contained in this Letter of Intent (a "Competing Transaction"). The Break-up Fee, if due, shall be payable only upon the closing of the sale of the assets of Seller to such other purchaser, and only from the closing proceeds, being specified that it is agreed upon by the Parties as an inducement to for Jezby to enter into the Letter of Intent, and as an inducement to implement the Letter of Intent by negotiating a Definitive Purchase Agreement.

(c)    The Termination Fees provided in this paragraph 6 (and in any superseding Definitive Purchase Agreement) shall constitute the sole and exclusive remedy of Jezby in the event the sale transaction contemplated by the Definitive Purchase Agreement fails to close as the result of the Seller entering into a Competing Transaction as described above (and such remedies shall be subject to the limitations set forth above); provided, however, that Jezby shall otherwise be entitled to specific performance if the Seller fails or refuses to close for any reason other than the Seller entering into a Competing Transaction at the Sale Hearing.

7.    Satisfaction or Waiver of Conditions Precedent. In order to move toward the Sale Hearing Date, the parties agree that they will meet the conditions precedent set forth in this letter, as follows:

(a) Within eight days after execution of this Letter of Intent, the Seller shall file a motion with the Bankruptcy Court seeking entry of an order (the "Sale Process Order") to be obtained no later than two (2) business days after signing of the Definitive Purchase Agreement (1) approving (A) the Reimbursement Payment (on the terms and conditions, and as defined above), (B) the Break-up Fee (on the terms and conditions, and as defined above) and (C) the other Binding Provisions (as defined above) of this Letter of Intent, and (2) establishing a Sale Hearing Date for the Assets (as described herein) on April 9, 2021, or the soonest date thereafter made available by the Bankruptcy Court, together with other deadlines for parties submitting competing bids at the Sale Hearing. The motion will establish bid procedures in form and substance acceptable to Jezby and will request that any competing bidders be required to submit to the Seller no later than April 5, 2021, both (I) a purchase agreement identical to the Definitive Purchase Agreement, except for the purchase price (no financing contingency, no due diligence contingency, and no "board approval" or similar contingency), but without any Termination Fees or bid protections, and (II) a Deposit (as defined below). Copies of any such competing bids shall be immediately provided to Jezby. The motion shall also request that the minimum initial overbid shall be in the amount of the Total Consideration, plus the Termination Fees, plus $100,000, as a condition of submitting a competing bid (and that subsequent overbids be submitted in increments of at least $100,000).

(b) The parties shall negotiate and execute by no later than March 6, 2021, the Definitive Purchase Agreement for the proposed Transaction, consistent with the terms of this letter. The Definitive Purchase Agreement shall have no financing contingency, no due diligence contingency, and no "board approval" or similar contingency. The Definitive Purchase Agreement shall contain a Deposit requirement, as set forth below.

(c) The Seller shall submit the Definitive Purchase Agreement to the Bankruptcy Court by no later than March 8, 2021, together with a Motion to Sell the Assets of Seller (the "Sale Motion"), to be considered by the Court on the Sale Hearing Date, subject to higher and better offers.

(d) Upon execution of the Definitive Purchase Agreement, Jezby shall pay into escrow (to be held by Seller's counsel, as agent) a deposit in the amount of $100,000 or a letter of credit of equivalent value (the "Deposit"). Pursuant to the procedures identified herein, competing bidders shall also be required to pay into escrow with Seller's counsel a Deposit in the amount of 10% of their proposed purchase price. The Sale Hearing Date may be continued upon the mutual agreement of the Seller and Jezby, and upon approval by the Bankruptcy Court.

(e) The failure of the Seller to Close the Transaction by the Closing Date shall, at Jezby's sole option, entitle Jezby to the return of the Deposit (unless the failure to Close the Transaction by such date is the result of a default by Jezby under the Definitive Purchase Agreement).

8. Conditions to Closing. Closing of the Transaction contemplated by the Letter of Intent is conditional upon the following:

4

**EXHIBIT A** OK

(a)     to the extent that any conditions set forth above were not satisfied by such dates as specified, and Jezby and the Seller agreed to extend the date for such requirement, such conditions shall have been satisfied prior to Closing;

(b)     the signatories obtaining prior to closing all necessary third-party, court and governmental consents and approvals necessary or reasonably desirable for the transactions contemplated by this Letter of Intent;

(c)     the absence as of the Closing Date of any material adverse change since the date of the most recent audited financial statements in the operations or financial condition of the Assets and the business which they support;

(d)     the entry of a Bankruptcy Court Order in form and substance satisfactory to Jezby approving the sale of the Assets pursuant to the terms of the Definitive Purchase Agreement and making findings, *inter alia*, that Jezby purchased the Assets in good faith and at arm's length, and entitling it to the protections of §363(m) of the Bankruptcy Code (the "Sale Order"), which Sale Order shall not be subject to any stay imposed by any court on or prior to the Closing Date;

(e)     Seller shall have cured, to Jezby's satisfaction, any material defects in the chain of title to the intellectual property rights pertaining to the Assets that may be revealed in the course of Jezby's due diligence;

(f)     all representations and warranties set forth in the Definitive Purchase Agreement shall be true and correct as of Closing and Seller shall have performed all covenants and obligations to be performed prior to Closing;

(g)     Jezby shall have been successful in acquiring the assets of Blade SAS in the insolvency proceeding involving Blade SAS in France; and

(h)     such other conditions as are agreed in the Definitive Purchase Agreement.

9.     Entire Agreement. This Letter of Intent embodies the entire understanding and agreement between Jezby and the Seller with respect to the subject matter hereof.

10.    Governing Law. This Letter of Intent is governed by and shall be interpreted under the laws of the State of Delaware.

11.    Counterparts. This Letter of Intent may be signed in several counterparts, any one of which need not contain the signature of more than one signatory, but all such counterparts taken together will constitute one and the same document. This Letter or Intent may be executed by facsimile signatures or via pdf and such signature will be deemed binding for all purposes of this Letter of Intent, without delivery of an original signature being thereafter required.

If you are in agreement with the terms of this Letter of Intent, please date and sign in the space provided below and return a signed copy by email to Mr. Octove Klaba at octave.klaba@jezby-ventures.com. If Seller has not executed this Letter of Intent on or

before 6 p.m. Eastern time on March 3, 2021, the matters set forth herein shall be deemed withdrawn and of no further force or effect.

Best regards,

**Jezby Ventures**

By: _____
Name: Octave Klaba
Title: President

*Octave Klaba*

Signé par Octave Klaba
✓ Signé et certifié par yousign

Agreed to and accepted on March ___, 2021,

**Blade Global Corporation**

By: _____
Name: Perry Michael Fischer
Title: President

14889926.4

6

EXHIBIT A

Case: 21-50275    Doc# 23    Filed: 03/08/21    Entered: 03/08/21 15:18:27    Page 15 of 16

Attachment 1 - Assets

The Assets shall include such assets as Jezby shall select from [all properties and assets of any kind or nature, real or personal, tangible or intangible that relate to the ownership, operation and management of the business of the Seller, including all servers and computes operated or used by the Seller as well as all equipment necessary for their operation (including cables, among others), all other tangible items of property, goodwill or assets, all items in inventory and all existing clients contracts]